UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| DEBRA LYNN NASH, | ) | CIV. 05-5045 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| vs. | ) | AND ORDER |
| | ) | |
| HAYLOFT PROPERTY | ) | |
| MANAGEMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Pending before the Court is a motion for summary judgment [doc. #26] by Defendant Hayloft Property Management, Inc. (Hayloft). All briefing is complete and this matter is ripe for disposition. As explained below, the Court will grant the motion for summary judgment.

## I. Background

The Plaintiff filed her Complaint in this case on June 3, 2005. The Complaint contains four counts and alleges discrimination based on race and sex, retaliation, and intentional infliction of emotional distress. Hayloft has moved for summary judgment.

The Plaintiff has not filed a true response to Hayloft's Statement of Material Facts. The Plaintiff has filed a "Responsive Statement of Material Facts" [doc. #33]. However, that document does not fully comport with the Court's Local Rules, LR 56.1(C), which requires that the papers opposing summary judgment include a short and concise statement of material facts to which it is contended there exists a genuine issue to be tried. That rule also requires the opposition to respond to each paragraph in the moving party's statement with a separately numbered response and appropriate citation to the record. Also, LR 56.1(D) provides that all

facts set forth in the moving party's statement will be deemed admitted unless controverted in the statement required of the opposing party. The "Responsive Statement" largely provides information irrelevant to the pending motion. However, due to the Plaintiff's pro se status, the Court will consider the "Responsive Statement," to the extent it responds to Hayloft's statement, as best the Court can decipher.

In July 1997, the Plaintiff, a Native American female, see doc. #33 ¶ 1, began working as a leasing consultant for Hayloft, a company that manages residential apartment complexes. See doc. #28, Ex. A (Nash Dep.) at 12:14-16, 13:9-11. The Plaintiff was promoted to assistant manager in October 2002. Id. at 14:7-8. On January 15, 2003, the Plaintiff was talking to co-worker Jeff Campbell at her desk, when co-worker Duane Grosz approached Campbell with an email showing a woman in a bathing suit. Id. at 59:12-15, Ex. 5. Although the Plaintiff could see the image through the paper, id., Ex. A at 59:12-15, she did not complain about it and does not know if Duane Grosz showed it to anyone else, id. at 61:18-62:1. In December 2002, Duane Grosz showed the Plaintiff a book of photographs he had compiled of the "wilder" days of the Sturgis Rally, asking if the Plaintiff wanted to look at it but warning her of its graphic contents. Id. at 62:2-15. The Plaintiff admits Duane Grosz had shown items like this to other Hayloft employees, both male and female. Id. at 63:25-64:12. Patrick Aplin, a white male, complained to Regional Manager Todd Nordmeyer about the materials. See doc. #33 ¶ 12.

The Plaintiff was off work for a period starting on January 22, 2003. Upon her return on February 15, 2003, Hayloft's Director of Property Management, James Henneberry, spoke with her about Duane Grosz's behavior. See doc. #28, Ex. A at 64:17-65:9. The Plaintiff told Henneberry that Duane Grosz's behavior, including the email and Sturgis Rally book, was

being blown out of proportion by other employees, that it was a shame to make an issue of the behavior, and that she had not been offended by anything Duane Grosz had shown her.  Id. at 65:14-66:1; Alexander Aff. Ex. B.  The Plaintiff also told Henneberry that she did not take Duane Grosz's behavior as sexually suggestive, nor did she consider it in any way to be sexual harassment.  Id., Ex. A at 66:5-12.  Later that day, Henneberry told the Plaintiff that he had spoken with Duane Grosz, and that Duane Grosz had agreed to stop this behavior.  Id. at 66:16-23.  After February 15, 2003, Duane Grosz did not show the Plaintiff sexually related material or engage in sex-related talk.  Id. at 66:24-67:4.  In March 2003, Nordmeyer and Gene Uher called Plaintiff into a conference room and told her she had been disobedient to her supervisor, Kathy Grosz.  Id. at 16:10-25.  Plaintiff was not written up for this discussion, she was not put on probation, her pay and benefits were not reduced, she was not demoted or subject to a title change, and nothing was put in her file.  Id. at 25:7-19.

In June 2003, Plaintiff was the subject to a procedure known as "secret shopping," where someone is sent to an apartment complex to evaluate the leasing consultant.  On that particular day, a Hayloft employee from another facility, Jim Albee, and Karmen Albee came to "shop" the Plaintiff.  Id. at 26:21-27:3.  The Plaintiff asked Jim Albee for identification, recognized him as a Hayloft employee, and realized he was there to shop her.  Id. at 26:13-27:8.  Plaintiff agrees that there are benefits to shopping leasing personnel but indicated it was stressful for her to know the evaluation was occurring.  Id. at 27:13-28:7.  The Albees shopped another Hayloft employee, Melanie Ochalik, on the day they shopped Plaintiff.  Id., Alexander Aff., Ex. C.  The Plaintiff was not written up for the Albee shop, nothing was placed in her file

(other than the report), she did not lose any pay, benefits, job responsibilities, or job title, and she was not put on probation as a result.  Id., Ex. A at 30:5-20.

In July 2003, Plaintiff was shopped a second time by Sandy Mercy.  However, the Plaintiff admits that Hayloft consistently has taken the position that Mercy was sent to shop another employee, and that the Plaintiff cannot dispute this fact.  Id. at 34:11-16, 35:3-5.  Plaintiff voluntarily resigned after that shop.  Id., Alexander Aff., Ex. D, Response to Request No. 8.  Hayloft asked the Plaintiff to return to work, which the Plaintiff did.  Id., Response 9.  Just as with the Albee shop, the Plaintiff was not written up for the Mercy shop, nothing was placed in her file (other than the report itself), she did not lose pay, job responsibilities, job title, or benefits, and she was not put on probation.  Id., Ex. A at 47:23-48:12.  Nordmeyer told the Plaintiff to disregard the shop and stated he would take the report out of her file and tear it up if the Plaintiff so desired.  Id. at 48:14-21.  Mercy shopped another Hayloft employee, Kathy Klemman, on the day she shopped the Plaintiff.  Id., Alexander Aff., Ex. E.

On July 29, 2003, after a positive review, Kathy Grosz and Nordmeyer recommended the Plaintiff receive a raise.  Id., Ex. A at 70:5-71:15; Ex. 6; Ex. 7.  On December 8, 2003, Hayloft terminated the Plaintiff because she had lost interest in her work, wanted to be fired, and asked Nordmeyer to terminate her.  Id., Alexander Aff., Ex. F; Ex. J ¶ 2.

On February 11, 2005, over fourteen months after the Plaintiff's termination, Hayloft sent Cory Snyder to the Prairie Tree Apartments, where the Plaintiff was then working, to investigate the competition.  The Plaintiff believes Snyder was there to shop her rather than the apartments, but she admits that it would be reasonable for Hayloft to shop its competition to see the competition's apartments, amenities, prices, and leasing specials.  Id., Ex. A at 50:19-

4

51:25.  Snyder did not say anything negative to Prairie Tree personnel about the Plaintiff, and his report about the shop says nothing about her.  Id. at 52:1-7, Ex. 4.  Neither Kathy nor Duane Grosz, who are married, had any issue with the Plaintiff, acted out against her, or held any ill feelings toward her.  Id., Ex. A at 43:9-11, 58:1-3, 67:5-11, 69:4-13.  After the Mercy shop in early July 2003, the Plaintiff requested Hayloft take various forms of recourse against Bridgewood Estates' manager, Jeanie Mohni, whom the Plaintiff believes wrote the Mercy report.  Id., Alexander Aff., Ex. I, Pl.'s Answer to Interrogatory 16; Ex. A at 37:18-22.

During her employment, the Plaintiff was an assistant manager under Duane Grosz, the maintenance supervisor, among other supervisors.  Id., Ex. A at 15:10-13, 75:11-12.  Duane Grosz's immediate supervisor was Nordmeyer.  Id. at 75:11-12.  Another employee, Tom Ringheimer, was given a $.57 raise at a time when the Plaintiff received a $.50 raise.  Id. at 73:17-21.  At the time, Ringheimer was coming off his probationary period.  Id. at 74:12-18.  Ringheimer was a maintenance employee with different job responsibilities than the Plaintiff's, and the Plaintiff is unaware of Ringheimer's job performance.  Id. at 73:22-74:11.

During the Plaintiff's employment with Hayloft, Mohni was promoted to an assistant manager position.  At the time of Mohni's promotion, the Plaintiff was not living on Hayloft's property, and Hayloft had a policy against promoting people not living on-site.  Id., Alexander Aff., Ex. J ¶ 3.  When Hayloft changed the policy regarding living on-site, the Plaintiff was promoted to assistant manager.  Id.  When Plaintiff raised the issues of Mohni's pay and working schedule with Hayloft, it immediately gave Plaintiff a raise and also tried to have her work from 8:15 a.m. to 5:15 p.m.  Id., Ex. A at 83:7-85:3.  The only individuals the Plaintiff know who saw the Mercy report were Kathy Grosz and Mohni.  Id. at 85:24-87:1.

5

## II. Discussion

**A.     Summary Judgment Standard**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Id.; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth *specific* facts showing that a genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

The Supreme Court has instructed that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts," and "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87.

B.     **Hostile Work Environment**

"Title VII [] prohibits an employer from subjecting its employees to a hostile work environment 'because of such individual's race [or] sex . . . .'" Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005) (quoting 42 U.S.C. § 2000e-2(a)(1)). To establish a claim for a hostile work environment based on sexual or racial harassment, the Plaintiff must prove (1) she is a member of a protected group, (2) she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic, (4) the harassment affected a condition, term, or privilege of employment, and (5) the employer knew or should have known about the harassment and did not take prompt and effective remedial action to end the harassment. Id.; Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1106 (8th Cir. 1998).

"The Supreme Court has 'made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.'" Tuggle v. Mangan, 348 F.3d 714, 720 (8th Cir. 2003) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). Sexual and racial harassment standards are demanding, and the conduct must be extreme, rather than merely rude or unpleasant. See id. (sexual harassment); see also Al-Zubaidy, 406 F.3d at 1039 (racial harassment). "More than a few isolated incidents are required," and the harassment alleged must be "so intimidating, offensive, or hostile that it poisoned the work environment." Tuggle, 348 F.3d at 720 (citation omitted). "Determining whether a work environment is hostile or abusive depends on all of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. at 721 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

7

### 1. Hostile Work Environment–Sexual Harassment

As to the sexual harassment claim, the Plaintiff is able to establish that, as a female, she is a member of a protected class. However, the Plaintiff has not provided evidence to satisfy the remaining four elements of a prima facie sexual harassment case. As to the second element, the Plaintiff cannot show she was subjected to unwelcome sexual harassment. The evidence before the Court indicates that, whatever conduct Duane Grosz engaged in, it was not unwelcome. As to the e-mail Duane Grosz showed Campbell, that e-mail was not shown to the Plaintiff, although the Plaintiff could see the image through the sheet of paper. The Plaintiff did not complain to anyone about the image. Also, the Plaintiff stated during her deposition that Duane Grosz asked her if she wanted to see the photographs of the Sturgis Rally and warned her of its graphic content. The Plaintiff looked at the book anyway. Later, the Plaintiff told Henneberry that Duane Grosz's behavior involving the e-mail and the Sturgis Rally book were being blown out of proportion by others. The Plaintiff also testified that she in no way took Duane Grosz's behavior as sexually suggestive or as sexual harassment.

The third element requires the Plaintiff show the harassment was based on her sex. Even assuming Duane Grosz's conduct constituted unwelcome sexual harassment, the Plaintiff has not produced evidence to show it was based on her gender. "The based on sex requirement forces a plaintiff to prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior." Pedroza v. Cintas Corp. No. 2, 397 F.3d 1063, 1068 (8th Cir. 2005). "Consequently, to succeed on a hostile work environment claim under Title VII, a plaintiff must show 'that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] . . .

because of . . . sex.'" Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). "The critical issue is whether members of one sex are subjected to unfavorable employment conditions to which members of the other sex are not." Hesse v. Avis Rent A Car System, Inc., 394 F.3d 624, 630 (8th Cir. 2005). The behavior at issue in this case was not based on the Plaintiff's sex. Duane Grosz showed the sexually related materials to both males and females. The Plaintiff admitted during her deposition it was not her impression that Duane Grosz showed her any of the materials or told her jokes because she was a female. The Plaintiff also stated that Duane Grosz's jokes, e-mails, and other behavior were not done in an attempt to get sexual favors from her. Thus, because Duane Grosz's behavior was not based upon the Plaintiff's sex and did not subject her to unfavorable employment conditions to which members of the opposite sex were not, the Plaintiff has failed to satisfy this element.

  The fourth element requires the Plaintiff show the alleged harassment was "so severe or pervasive as to alter a term, condition, or privilege of [her] employment." See Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002). "To clear the high threshold of actionable harm, [the Plaintiff] has to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult.'" Id. (quoting Harris, 510 U.S. at 21). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview." Id. (citation omitted). This fourth element includes both objective and subjective components: "an environment that a reasonable person would find hostile and one that the victim actually perceived as abusive." Id. The conduct at issue in this case was not sufficient to satisfy this element. The Plaintiff admitted that Duane Grosz's behavior, jokes, e-mail, and

9

Sturgis Rally book did not intimidate her, seriously affect her psychological well being, or unreasonably interfere with her work, aside from the time spent viewing the items. As noted above, the Plaintiff believed other employees were blowing things out of proportion, and she was not offended by the behavior. Finally, the Plaintiff did not take the behavior as sexually suggestive or sexual harassment. Duane Grosz's behavior was not objectively or subjectively intimidating, hostile, or abusive, and the Plaintiff cannot satisfy the fourth element.

Finally, although Hayloft does not dispute that it knew about the conduct at issue, the Plaintiff is unable to show that Hayloft did not take remedial action. Upon the Plaintiff's return to work on February 15, 2003, Henneberry talked to her about Duane Grosz's conduct. The Plaintiff admitted that, after that conversation, Duane Grosz did not show her any more sexually related material or engage in commentary that was sexually related. The Plaintiff has not presented any evidence that Hayloft failed to take proper remedial action. Based on the foregoing, summary judgment will be granted on the Plaintiff's sexual harassment claim.

   **2.**  **Hostile Work Environment–Racial Harassment**

As to the racial harassment claim, the Plaintiff is able to establish that, as a Native American, she is a member of a protected class. However, just as with her sexual harassment claim, the Plaintiff is unable to satisfy the remaining elements of this claim. The second and third elements require the Plaintiff show she was subjected to unwelcome harassment that was, as to this claim, based on her race. According to the Plaintiff, see doc. #28, Ex. A (Nash Dep.) at 23:14-18, her only evidence related to this element are 1) that after the Plaintiff stated they should hire people from the Mission to move things, Kathy Grosz responded that she was "not going to let them touch my stuff"; and 2) Kathy Grosz was planning to give a Buffalo picture

to Darlene Dingman because Ms. Dingman was Native American and "look[ed] a lot more Native American than" the Plaintiff, see id. at 21:2-24:18.  The Mission, by the Plaintiff's own admission, is not a Native American organization, and its residents are largely homeless, unemployed people with societal problems and possibly criminal backgrounds.  The Plaintiff also admitted that she had no evidence that Kathy Grosz's comment about the Mission was racially motivated, and that Kathy Grosz never made any directly racial remarks.  Id.  Kathy Grosz's comment about the Mission was not sufficient to show the Plaintiff was subjected to unwelcome harassment based on her race.  Kathy Grosz's comment regarding the Buffalo picture did not amount to harassment of the Plaintiff but, instead, benefitted another Native American, Ms. Dingman.  Thus, the Plaintiff is unable to satisfy these elements of her claim.

     Even assuming that Kathy Grosz's comments were sufficient evidence to satisfy those elements, the Plaintiff cannot satisfy the fourth element, which requires she show the harassment affected her employment.  "Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment."  Elmahdi v. Marriott Hotel Servs., Inc., 339 F.3d 645, 652 (8th Cir. 2003).  "For harassment to affect a condition of employment the conduct must be severe 'as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim.'"  Id. (quoting Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998)).  The Plaintiff must show the workplace was "permeated with discriminatory intimidation, ridicule, and insult," and "'[m]ere utterance of an . . . epithet that engenders offensive feelings in a[n] employee . . . does not sufficiently affect the conditions of employment' to give rise to a triable hostile work environment claim.'"  Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031, 1035 (8th Cir. 2006) (quoting Elmahdi, 339 F.3d at 652).  Kathy

Grosz's second comment, about the Buffalo picture, was the only one containing any reference to race at all. The Eighth Circuit has ruled an "epithet that engenders offensive feelings," is insufficient to give rise to an actionable claim. Kathy Grosz's comment did not even rise to the level of such an epithet. The Plaintiff's evidence is insufficient to demonstrate a severe and pervasive harassment affecting the terms, conditions, or privileges of her employment.

Finally, even assuming the Plaintiff established a prima facie case of racial harassment, "if the harassment was committed by an employee who supervised [the Plaintiff], [Hayloft] as her employer is vicariously liable for the harassment unless it can establish the affirmative defense" established in Burlington Industries., Inc. v. Ellerth, 524 U.S. 742, 765 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998). Joens v. John Morrell & Co., 354 F.3d 938, 940 (8th Cir. 2004). "When no tangible employment action is taken, a defending employer may raise" the defense, "subject to proof by a preponderance of the evidence." Williams v. Mo. Dep't of Mental Health, 407 F.3d 972, 976 (8th Cir. 2005). "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior[] and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. In the present case, Hayloft, by adopting a zero-tolerance anti-harassment policy containing a complaint procedure, has established the first element of the defense. See id. (concluding zero-tolerance anti-harassment policy, reporting procedure, and employee training were reasonable actions to prevent harassment under Faragher). Also, Hayloft establishes the second element, because Hayloft has shown the Plaintiff did not take advantage of the policy, a copy of which she received, by

12

making a complaint thereunder.  See doc. #26, Ex. H; doc. #26, Ex. A (Nash Dep.) at 82:2-8. In sum, the Plaintiff is unable to establish a claim for racial discrimination or overcome the affirmative defense, and summary judgment will be granted on this claim.

**C.     Retaliation**

"Title VII prohibits retaliation against an employee who files charges of discrimination or assists others in opposing discrimination."  Thompson v. Bi-State Dev. Agency, 463 F.3d 821, 826 (8th Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)).  "[A]bsent direct evidence of retaliation, we must apply the McDonnell Douglas[1] three-part burden-shifting analysis to [the Plaintiff's] retaliation claim."  Id.  Using that framework, the Court must first ask whether the Plaintiff has presented a prima facie case of retaliation, which requires the Plaintiff present evidence that 1) she engaged in activity protected by Title VII; 2) her employer took adverse employment action against her; and 3) there exists a causal connection between the two.  Id.

The evidence before the Court, taken in the light most favorable to the Plaintiff, shows her protected activity was participation in the sexual harassment investigation of Duane Grosz. The evidence also shows the Plaintiff was terminated, which constitutes adverse employment action.  However, the Plaintiff is unable to show a causal connection between her participation in the investigation and her termination.  The Eighth Circuit has noted that the "timing of [a] termination can be close enough to establish causation in a prima facie case."  Haas v. Kelly Servs., Inc., 409 F.3d 1030, 1037 (8th Cir. 2005).  However, that court also has repeatedly stated that "[g]enerally, more than a temporal connection between the protected conduct and

---

[1]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

the adverse employment action is required to present a genuine factual issue on retaliation."
Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc); see also Haas, 409 F.3d at 1037.  Also, the court's "recent cases have . . . made clear that a 'mere coincidence of timing' can rarely be sufficient to establish a submissible case of retaliatory discharge."
Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002).  In the present case, Kathy Grosz approved the Plaintiff's "Well Deserved Annual Raise" after a positive annual review on July 29, 2003.  See doc. #28, Ex. A (Nash Dep.) at 70:5-71:15; doc. #28, Ex. 6, Ex. 7.  In the report on that annual review, Kathy Grosz commented on the Plaintiff's reliability, her ability to work with others, the "great job" the Plaintiff did, and how the Plaintiff always got a lot of work completed, among other comments.  The Plaintiff talked to Henneberry about the investigation into Duane Grosz's activities on February 15, 2003.  The Plaintiff was fired almost ten months later, on December 8, 2003, at her request.  This gap in time, especially given the Plaintiff's raise, performance evaluation, and request to be fired, weakens any inference of retaliatory motive.  Hesse, 394 F.3d at 633; see also Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999) (concluding a four-month gap weakened the inference of retaliation).  The Plaintiff is unable to show a causal connection between her protected activity and her termination.

  However, assuming the Plaintiff established the prima facie case, the burden shifts to Hayloft to present a legitimate, non-discriminatory reason for terminating her.  Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 502 (8th Cir. 2005).  Hayloft has done so.  Specifically, the evidence shows the Plaintiff had "[l]ost interest in her work," she "[w]anted to be fired," and "[s]he wanted [Nordmeyer] to fire her."  See doc. #28, Ex. F.

Thus, the burden shifts back to the Plaintiff to show Hayloft's reason was merely pretextual. Kasper, 425 F.3d at 502. As Hayloft notes, the Eighth Circuit has opined that "[p]robably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment." Cherry v. Ritenour Sch. Dist., 361 F.3d 474, 479 (8th Cir. 2004) (citation omitted). The Plaintiff provides no evidence of pretext (the Plaintiff's brief addresses only the prima facie case). Thus, the Court itself will address whether the evidence shows similarly situated employees of a different race or sex were treated better than the Plaintiff. The Plaintiff has not identified which other individuals participated in the sexual harassment investigation. Nor has the Plaintiff shown how other individuals or employees were treated more favorably than she. In sum, the Plaintiff has not provided any evidence of pretext. Based on the foregoing, the Plaintiff is unable to make out a prima facie case of retaliation, and is unable to provide evidence of pretext in Hayloft's termination of her employment. Hayloft is entitled to summary judgment on the retaliation claim.

**D.    Discrimination**

Absent direct evidence, the Plaintiff's discrimination claims are analyzed under the McDonnell Douglas burden-shifting framework. Elmahdi, 339 F.3d at 656; Harris v. Sec'y, U.S. Dep't of the Army, 119 F.3d 1313, 1320 (8th Cir. 1997). First, the Plaintiff must present a prima facie case of discrimination: that 1) she is a member of a protected class, (2) she was meeting the employer's legitimate expectations, (3) she suffered adverse employment action, and (4) similarly situated employees that were not members of the protected class were treated differently. Richardson v. Sugg, 448 F.3d 1046, 1060 (8th Cir. 2006).

15

The Plaintiff, as a female and Native American, was a member of a protected class. Also, as noted above, the Plaintiff was terminated. Thus, the Plaintiff has made out the first and third elements of a prima facie case. However, the Plaintiff has not presented evidence that she was meeting Hayloft's legitimate performance expectations. The Plaintiff had lost interest in her work, was unhappy, displayed a belligerent attitude, and was belligerent in asking to be terminated. See doc. #28, Ex. F, Ex. J. The Plaintiff also had requested Mohni be disciplined for "sabotaging" the Plaintiff's work and for "her involvement in preparing the shopping report in July." Id., Ex. I ¶ 16. Such behavior does not meet an employer's legitimate business expectations. See, e.g., Larry v. Potter, 424 F.3d 849, 851 (8th Cir. 2005) (opining that employee's negative work attitude was a legitimate, nondiscriminatory reason); Fontana v. Henry Birks Jewelers, Inc., No. 85 C 5339, 1986 WL 10781, at *2 (N.D. Ill. Sept. 25, 1986) (noting that, unless unreasonable, "the employer sets the expectations," and one legitimate expectation is a "cooperative attitude toward supervisors from employees"). Thus, the Plaintiff is unable to show she was meeting Hayloft's legitimate expectations.

The fourth element of the prima facie case requires the Plaintiff show other employees outside the protected group (in this case, either males or non-Native Americans) were similarly situated in all relevant respects but were treated more favorably. Richardson, 448 F.3d at 1060. The Plaintiff points to Mohni, Duane Grosz, Ringheimer, and Kathy Grosz as similarly situated employees who were treated more favorably. However, the evidence shows Duane Grosz held a different position than the Plaintiff—he was the maintenance supervisor and she an assistant manager under his supervision. Also, Duane Grosz's conduct was inappropriate sexually related conduct, which he remedied after Henneberry spoke to him, while the Plaintiff

displayed a negative, belligerent attitude and requested to be fired.  During her deposition, the Plaintiff cited Ringheimer as another similarly situated employee treated more favorably, because Ringheimer received a $.57 raise, while the Plaintiff received only a $.50 raise.  See doc. #28, Ex. A (Nash Dep.) at 73:17-21.  However, Ringheimer worked in a different position–maintenance employee–with different job responsibilities, Ringheimer was just coming off a probationary period at the time of the raise, and the Plaintiff had no personal knowledge about Ringheimer's job performance.  Id. at 74:8-11.  Mohni also was not similarly situated.  At the time Mohni was promoted to assistant manager (ten months before the Plaintiff was similarly promoted), Hayloft had a policy requiring managers to live on-site. Mohni lived on-site, while the Plaintiff did not.  When Hayloft changed the policy to permit managers to live off-site, the Plaintiff was promoted.  Finally, the Plaintiff has not directed the Court to evidence showing she and Kathy Grosz were similarly situated.  The only evidence the Court has before it shows Kathy Grosz was the Plaintiff's immediate supervisor in March 2003, and Kathy Grosz approved the Plaintiff's raise after an annual review on July 29, 2003. See doc. #28, Ex. A (Nash Dep.) at 70:5-71:15; doc. #28, Ex. 6, Ex. 7.  The Plaintiff has not established a prima facie case of discrimination based on her sex or race.

However, assuming the Plaintiff established the prima facie case, the burden shifts to Hayloft to present a legitimate, non-discriminatory reason for firing the Plaintiff.  As noted above, Hayloft has shown the Plaintiff had "[l]ost interest in her work," "[w]anted to be fired," and "wanted [Nordmeyer] to fire her."  See doc. #28, Ex. F.

Thus, the burden shifts back to the Plaintiff to show Hayloft's reason was pretextual. As noted above with regard to the retaliation claim, "[p]robably the most commonly employed

method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment." Cherry, 361 F.3d at 479 (citation omitted).  At this stage, "[t]he test to determine whether employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one." Id. (quoting EEOC v. Kohler Co., 335 F.3d 766, 775 (8th Cir. 2003)).  "Specifically, the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Id. (citation omitted).  The Plaintiff has not offered any other evidence or argument about pretext with regard to her discrimination claims, at least no more than that presented as to the prima facie case.  Based on the Court's conclusion, above, that the Plaintiff could not satisfy the fourth element of the prima facie discrimination case, the Court must also conclude that the Plaintiff cannot meet the more rigorous test to determine whether she was similarly situated to other employees to show the termination was pretextual.  Thus, Hayloft is entitled to summary judgment on the Plaintiff's claims for race and sex discrimination.

E.   **Intentional Infliction of Emotional Distress**

To prove a claim for intentional infliction of emotional distress, the Plaintiff must establish that "the defendant (1) by extreme and outrageous conduct, (2) acted intentionally or recklessly to cause the plaintiff severe emotional distress, (3) which conduct in fact caused the plaintiff severe distress, and (4) the plaintiff suffered an extreme, disabling emotional response to the defendant's conduct." Harris v. Jefferson Partners, L.P., 653 N.W.2d 496, 500 (S.D. 2002).  The trial court makes the initial determination whether a defendant's conduct is extreme and outrageous.  Id.  The conduct at issue must be "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." Id. (citation omitted). "Liability for this tort will 'not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities.'" Id. (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). The South Dakota Supreme Court, "[o]n several occasions," has "affirmed grants of summary judgment where the alleged conduct did not satisfy the 'extreme and outrageous' standard." Citibank (S.D.), N.A. v. Hauff, 668 N.W.2d 528, 536 n.7 (S.D. 2003).

      The Plaintiff has not pointed to any conduct that could be considered extreme or outrageous. The "shops" at the properties where the Plaintiff worked did not involve conduct that "exceed[ed] all bounds usually tolerated by decent society." See id. The Plaintiff claims the "Mercy shop" was outrageous because she already had been shopped in June 2003, because she believed the shop was in response to Duane Grosz's sexual harassment investigation, and because Mercy was Mohni's friend. However, the Plaintiff admits that it would have been beneficial to have a reliable person, like an employee's friend, conduct a shop. Further, the "Snyder shop," which occurred fourteen months after her termination did not involve outrageous conduct. The Plaintiff admits Snyder did not say anything negative about her to Prairie Tree personnel. Snyder's report about the shop said nothing about the Plaintiff. The Plaintiff also admits that it is reasonable for Hayloft to shop its competition. Even assuming someone with Hayloft knew that the Plaintiff worked for Prairie Tree, nothing that occurred during that shop would have amounted to extreme and outrageous conduct. Hayloft is entitled to summary judgment on this claim.

F.    **Defamation**

Although the Plaintiff's Complaint does not contain a count for defamation, the "Statement of Facts" therein states the report of the May 2003 shop was "libelous, defamatory and slanderous to her professional career and future employment opportunity." See Complaint ¶ 16. Hayloft moves for summary judgment, claiming the Plaintiff cannot make out a prima facie case for any such claim because any statement about her was not published. See SDCL 20-11-3 ("Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation.").[2] Based on the evidence before the Court, summary judgment would be proper on this claim. However, because the Plaintiff has not responded to Hayloft's motion for summary judgment on this claim, the Court considers it abandoned. See, e.g., State of S.D. v. U.S. Dep't of Interior, 401 F. Supp. 2d 1000, 1013 (D.S.D. 2005); Thomsen v. Ross, 368 F. Supp. 2d 961, 974 n. 9 (D. Minn. 2005). Based on the foregoing, it is hereby

ORDERED that the motion for summary judgment [doc. #26] by Defendant Hayloft Property Management, Inc. is GRANTED.

Dated this 28th day of December, 2006.

                                              BY THE COURT:

                                              /s/ *Andrew W. Bogue*
                                              ANDREW W. BOGUE
                                              SENIOR DISTRICT JUDGE

---

[2] Hayloft also points out that the Plaintiff's claim would more accurately be considered a claim for libel because the alleged statement was in writing.